**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **DAVID BLUE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **THOMAS ("T.J.") WARREN, SCOTT** ) | |
| **MORSE; LISA BLUE; ROSE GRUNDY;** ) | |
| **VERETTA GARNETT; LEAH BROWN;** ) | |
| **ELAINA SCERENA, LISA IRVIN;** ) | |
| **MICHELLE SCHAFER; CITY OF** ) | |
| **MARION; WILLIAMSON COUNTY** ) | |
| **STATE'S ATTORNEY** ) | |
| ) No. | |
| ) | |
| ) **JURY TRIAL DEMANDED** | |
| Defendants. ) | |

## COMPLAINT

Plaintiff, DAVID BLUE, by his undersigned attorney, for his complaint against

THOMAS WARREN, SCOTT MORSE, ROSE GRUNDY, VERETTA GARNETT, LEAH

BROWN, ELAINA SCERENA, LISA IRVIN, MICHELLE SCHAFER, LISA BLUE, CITY OF

MARION, and the WILLIAMSON COUNTY STATE'S ATTORNEY.

## INTRODUCTION

1.     Plaintiff, David Blue, was falsely charged, prosecuted and convicted for sexually

assaulting his adopted 12-year-old daughter N.B. – a crime he did not commit. Defendants

fabricated a false story that was fed to N.B., an intellectually and cognitively delayed child who

was highly suggestible and had a history of sexual abuse prior to being adopted by the Plaintiff

and his wife, Defendant Lisa Blue.

2.      The fabricated allegations against Plaintiff came less than two months after Defendant Blue lost her bid for sole custody of the couple's children in an acrimonious custody dispute.

3.      During an interview with Marion police officer Defendant Warren and DCFS investigator Defendant Grundy, N.B. denied that she had been sexually abused by her father. Defendant Lisa Blue admitted that N.B. never expressly accused Plaintiff of sexual abuse, but Defendant Blue claimed she suspected it. Defendants Warren, Grundy, and Blue together concocted a false story of sexual abuse that they fed to N.B. At the direction of Defendants Warren and Grundy, Defendant Blue coached N.B. over several days to adopt the false and fabricated story so she could repeat it to a forensic interviewer.

4.      N.B. attempted to repeat the false story to Defendant Brown during a forensic interview supervised by Defendant Grundy. Because N.B. could provide no details or timeline for these events, Defendants Brown assisted her in filling in the gaps with leading questions, all which Defendant Grundy looked on and helped direct the forensic interview.

5.      After the forensic interview, Defendants Warren and Grundy attempted to located corroborating evidence for the claim but were unsuccessful. Plaintiff was an accomplished nurse anesthetist and had never been accused in of any type of inappropriate sexual conduct toward anyone. The case stalled for a three-month period due to the lack of supporting evidence.

6.      Defendants Warren, Grundy and Garnet reached out to Defendant Prosecutor Lisa Irvin to inquire about whether criminal charges would be approved against the Plaintiff. Defendant Irvin told the Police Officer and DCFS Defendants that she would approve charges if DCFS made a finding that abuse was indicated but that she would not be able to get approvals to charge if DCFS did not make a finding that abuse was indicated.

7.    After developing no additional evidence and after obtaining exculpatory DCFS records that showed that N.B. was prone to deception, was easily suggestible by adults, and had suffered prior sexual abuse, Defendants Grundy, Garnett and Scerena agreed to make a finding that abuse was indicated to ensure a criminal prosecution as directed by Defendant Irvin.

8.    Defendant Irvin interviewed N.B. thereafter. N.B told the prosecutor that she did not remember any abuse. Defendant Irvin helped reinforce the false narrative that the other Defendants had created and fed to N.B. during her forensic interview, encouraging her to repeat it and suggesting that she was just afraid of her father. Defendant Irvin initiated charges against Plaintiff despite having coached N.B.'s story and despite the absence of any non-fabricated evidence that suggested any abuse occurred.

9.    At Plaintiff's criminal trial, N.B. admitted that she was not sure that she was abused at all.

10.    At the close of the case, Defendant Schafer, the Williamson County Circuit Court judge presiding over the matter, retired to her chambers and reviewed police reports and DCFS documents that had been produced to her chambers earlier in the litigation because of their sensitive nature. The materials were *not* offered into evidence at Plaintiff's trial and should not have been reviewed by the judge. Defendant Schafer forfeited her judicial function and adopted an investigative one when she reviewed, considered, and relied on materials that were not introduced into evidence as the basis for finding Blue guilty. Although she conducted that review of materials in her chambers, she was not functioning as a judge but was functioning as in investigator. She references the outside the record evidence in making her finding of guilt.

11.    Plaintiff, a 41-year-old successful and highly regarded nurse anesthetist, lost his job, his license, and his freedom following his wrongful conviction. After serving 20 months of a

six-year sentence of imprisonment, the Illinois Appellate Court reversed Blue's conviction

outright on May 2, 2023. *People v. David Blue*, 2023 IL App (5th) 220177

12.     The office of the Williamson County State's Attorney ("WCSAO")

unsuccessfully sought review from the Illinois Supreme Court. On September 27, 2023, the

Illinois Supreme Court denied the State's Petition for Leave to Appeal. The Illinois Appellate

court mandate reversing Blue's conviction was issued on December 7, 2023.

13.     Plaintiff now seeks justice for the inconceivable harm that the Defendants caused

him and redress for the incalculable loss of liberty and hardship that Plaintiff has endured and

continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of state law of Plaintiff's rights as secured by the United States Constitution as well

as the deprivation of rights under Illinois state law.

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper

under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events

giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

16.     Plaintiff David Blue is a 45-year-old man African American man who spent 20

months in prison for a crime he did not commit.

17.     At all relevant times, Defendants Warren and Morse were members of the Marion

Police Department. Each of these defendants conspired with one another and with other persons,

known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce

fabricated statements, and maliciously prosecute Plaintiff.

18.    At all relevant times, Defendant Grundy, Garnett, Brown, and Scerena, were employed by the Illinois Department and Children Family Services ("DCFS"). Each of these defendants worked hand and glove with the Marion Police Department Defendants in an investigatory capacity. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness testimony, coerce fabricated statements, and maliciously prosecute Plaintiff.

19.    At all relevant times, Defendant Irvin, while acting in an investigatory fashion, procured a fabricated statement from N.B. Defendant Irvin is sued for conspiring with the Defendant Officers, the DCFS Defendants and Defendant Blue to frame Plaintiff while acting in an investigatory capacity and without probable cause to believe that Plaintiff committed a crime.

20.    At all relevant times, Defendant Blue, was the adoptive mother of N.B.

21.    At all relevant times, Defendant Schafer was a Williamson County Circuit Court judge who acted in an investigatory function rather than a judicial one. Her conduct is not protected by any immunity, absolute or qualified, where her conduct was not judicial but rather investigate in nature and in violation of statutory and constitutional law.

22.    Defendant City of Marion is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

23.    Defendant Williamson County is a governmental entity within the State of Illinois which provides funding for the Williamson County State's Attorney's Office, which is responsible for paying any judgment entered against the Defendant Assistant State's Attorney Irvin.

24.    Each of the individual Chicago Police Officer Defendants and Assistant State's Attorney Defendant are sued in his or her individual capacity, and each acted under color of state

law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

25.     Each of the individual DCFS defendants are sued in their individual capacity, and each of them worked under color of law together with law enforcement, to assist in the criminal prosecution of the Plaintiff.

## FACTUAL ALLEGATIONS

### David and Lisa Blue Foster and Adopt N.B.

26.     Plaintiff and Defendant Blue started dating in 2003 after Plaintiff moved to central Illinois to work at Decatur Memorial Hospital. The couple left Illinois to move back to Plaintiff's home state of Louisiana for a couple of years before eventually marrying in April 2006.

27.     After Plaintiff obtained his master's degree in Baton Rouge, the couple moved back to Southern Illinois. They tried for years to have children but struggled with infertility. In 2012, the couple began fostering a 11-month-old boy, G.B., with an eye toward adoption.

28.     In June 2013, DCFS contacted the Blue family and asked whether they could foster a pair of siblings on an emergency basis for a short period of time. The Blue's agreed and opened their home to a 15-year-old boy, D.A. and his younger sister, six-year-old N.B.

29.     The short-term foster turned into a long-term foster arrangement. As of 2015, the Blue's were fostering two children (G.B. 4 and N.B. 8) D.A. aged out of foster care in and around 2015 but he had lived with the Blue's until that point.

30.     In 2016, the couple officially adopted G.B. and the following year they officially adopted N.B.

**N.B.'s Prior History of Abuse and Significant Behavioral and Intellectual Deficits**

31.    When the Blue's began fostering N.B. she had significant behavioral, cognitive, and intellectual deficits that were, in large part, a product of a profoundly neglectful and abusive childhood that pre-dated her placement with the Blue's. N.B's (and D.A's) birth mother suffered from severe mental health disorders and N.B. experienced extreme environmental neglect and had a substantial risk of physical and environment injuries.

32.    N.B. and her biological brother D.A. were removed from their birth mother's care in March 2013 (for a second time). At the time of N.B.'s placement with the Blue family, she had suffered physical and sexual abuse. DCFS was aware that N.B. had been sexually abused prior to placement with the Blue family and documented that prior sexual abuse. D.A. had told DCFS social workers that he believed she was molested between the ages of 10 months and 2 years, because she started engaging in inappropriate sexual behavior shortly thereafter. Additionally, N.B.'s biological mother claimed that N.B. had been sexually abused in a foster home that pre-dated her placement with the Blue's.

33.    Defendant Blue frequently expressed her belief that N.B. had been sexually abused because of inappropriate sexual behavior that she exhibited, including by attempting to touch her younger brother G.B. in sexual ways. Defendant Blue requested subsidies from DCFS to address N.B.'s behavioral issues which included the inappropriate sexual behavior, self-mutilation, and inappropriate urinating and defecating behaviors. DCFS approved those subsidies because of suspected child abuse that pre-existed N.B.'s placement with the Blue family.

**Plaintiff and Defendant Blue's Marriage Ends in an Acrimonious Divorce**

34.    Even before N.B.'s adoption was final, Plaintiff and Defendant Blue began experiencing difficulties in their marriage, in part, because Plaintiff had an affair that left

Defendant Blue angry and bitter. The couple decided to stick it out for the sake of their foster children and worked toward repairing their marriage with little success. The couple eventually separated in March 2017.

35.    The split was highly acrimonious and resulted in a divorce trial during which Defendant Blue sought sole custody of the children. Defendant Blue blamed Plaintiff for the split because of his infidelity.

36.    At no point prior to the custody hearing did Defendant Blue suspect or accuse Plaintiff of mistreating their children in any manner. At no point prior to the custody hearing did any of Plaintiff's foster children complain that Plaintiff had mistreated them in any manner, including sexually. At no point ever did any person suspect or accuse Blue of sexual misconduct in connection with his work as a nurse and medical provider. Indeed, by all accounts he was a devoted father who encouraged his children to succeed in school and in their extra-curricular activities.

37.    The couple's divorce was finalized in August 2019. Defendant Blue lost her bid for sole custody of the children and was furious that she did not receive a larger child support award.

**Defendants Fabricate Evidence that Plaintiff Sexually Assaulted N.B.**

38.    Less than two months later, on October 28, 2019, Defendant Blue walked into the Marion Police department and falsely reported to the Officer Defendants that N.B. had disclosed to her that Plaintiff had sexually abused her. In truth, N.B. had not complained of any act of sexual abuse to her mother but had merely complained that she did not want to go to her father's home because he made her attend her extra-curricular activities on the weekends and urged her study and practice the sports she was enrolled in.

39.     Defendant Warren reported the complaint to DCFS and arranged to interview Defendant Blue and N.B. with DCFS investigator, Defendant Grundy. Defendant Grundy was an investigator with DCFS who was assigned to the DCFS investigation and was assigned to assist the Marion police department with the criminal investigation

40.     Defendants Warren and Grundy interviewed N.B. and Defendant Blue at the Marion police department. Defendant Blue told Defendants Warren and Grundy that Plaintiff had cheated on her and reported that that he was into some "weird" things sexually.

41.     Both Defendants Warren and Grundy disapproved that Plaintiff, who was an African American man, was in a relationship with and had married a White woman.

42.     Defendants Warren and Grundy, in the presence of Defendant Blue then interviewed N.B. During the interview, N.B. denied any sexual abuse by her father. N.B. complained that she did not want to go to her father's house but denied that he had touched her in an inappropriate sexual way.

43.     After the interview, Defendants Warren, Grundy, and Blue discussed the fact that N.B. denied sexual abuse by the Plaintiff. Defendant Blue admitted to Defendants Warren and Grundy that N.B. had not expressly disclosed that Plaintiff had sexually abused her or touched her, but Defendant Blue told Defendants Warren and Grundy that she personally believed that N.B. was abused by the Plaintiff, pointing out that N.B. did not want to stay at her father's new house. Defendant Blue continued to reiterate that Plaintiff was into "weird" sexual things. Defendant Blue did not provide any facts that supported her belief that Plaintiff had sexually abused N.B.

44.     Defendants Warren and Grundy told Defendant Blue that she should trust her instincts and agreed that Plaintiff probably sexually abused N.B. even though there was no

evidence to support the accusation, other than a suspicion by any angry and bitter ex-wife who was aiming to get sole custody of her kids to punish the Plaintiff for his infidelities.

45.     Defendants Warren and Grundy explained to Defendant Blue that N.B. would be interviewed by a forensic interviewer and that Defendant Blue should practice a story with N.B. that she would repeat to the interviewer.

46.     Because the Defendants knew that there would be no physical evidence of child sexual abuse (because none had occurred), they decided to feed a false story to N.B. wherein N.B. accused Plaintiff of forcing her to commit an act of oral sex on him which would be consistent with an absence of physical evidence of sexual abuse. Defendants Warren, Blue and Grundy crafted a false narrative that Defendant Blue planned to feed to N.B. that N.B. would later repeat to a forensic interviewer.

47.     For the next three days, Defendant Blue fed a false story to N.B. which included incorporating facts that N.B. had described to Defendant Blue that occurred in a prior foster placement. For example, N.B. had told the Blue's about a time a foster parent had "choked" her. At Defendant Blue's urging, N.B. incorporated that fact into the false oral sex narrative that Defendant Blue had discussed with Defendants Warren and Grundy. Defendant Blue told N.B. that her father had put his penis in her mouth and that something that looked like "cake batter" came out. N.B. did not tell this story to Defendant Blue. Rather Defendant Blue introduced this false story to N.B. at the direction of Defendants Warren and Grundy.

48.     Defendants were easily able to manipulate N.B. into making a false allegation against her father because of her serious intellectual and cognitive delays. N.B. was easily coached and manipulated into lying. DCFS records showed that she had a history of understanding the truth from the lie, was highly suggestible, prone to confabulation, inclined to

say and do things to please adults, and had actually been a victim of sexual abuse prior to her placement with the Blue's.

49.     Defendant Blue brought N.B. for a forensic interview on October 31, 2019. Defendant Brown conducted the forensic interview while Defendant Grundy observed. At the time of the interview, Defendant Brown knew that N.B. had denied any acts of sexual abuse. Defendant Grundy told Defendant Brown that she believed that N.B. had been sexually abuse and told Defendant Brown the false narrative that she contrived with Defendants Warren and Blue.

50.     Defendants Grundy and Brown consulted with each other throughout the interview and Defendant Brown prompted N.B. when necessary, so that N.B. could repeat the false story that had been crafted by the Defendants and fed to N.B. by Defendant Blue. Defendant Brown, in collaboration with Defendant Grundy, manipulated and coerced N.B. into repeating the false narrative that Plaintiff had forced N.B. to commit an act of oral sex on him.

51.      Despite the fact that N.B. could provide no details about this alleged abuse and had no sense of when it happened, how often it happened, and could not even describe her feelings about the alleged abuse, Defendants Grundy and Brown coached N.B. to adopt the story through leading questions that required only 'yes' or 'no' responses.

52.     N.B. repeated the false story to please her mother who promised her that she would not have to go to her father's house and would be rewarded if she told the story to the forensic interviewer.

**Plaintiff Is Interviewed by Defendants Warren and Grundy**

53.     After the interview, Defendants Warren and Grundy interviewed the Plaintiff who vehemently denied any inappropriate conduct toward his daughter and urged Defendants to

investigate the false claims. Plaintiff told the Defendants that he had just gone through bitter divorce proceedings with Defendant Blue and that she had a strong motive to make up a false story after she was denied sole custody of their children.

54.    Defendants Warren and Grundy had first-hand knowledge that Defendant Blue was furious at Plaintiff and had blamed the demise of their marriage on his infidelity.

55.    Plaintiff urged the Defendants to speak to his colleagues and other members of the community who could vouch for the fact that he had never acted in appropriately with anyone. He reminded the Defendants that he had parented N.B. for seven years without incident and was a nurse anesthetist who had regular contact with children without any incident or claims of wrongdoing. Plaintiff pointed out that the timing of the allegation was highly suspicious and that they should investigate this claim.

56.    Plaintiff voluntarily provided a buccal swab for DNA analysis and gave Defendant Warren consent to search and photograph his home.

**Williamson County Assistant State's Attorney Lisa Irving Approves Charges**

57.    Over the next three months, Defendants Warren and Morse and the DCFS Defendants reviewed DCFS records and interviewed individuals in an effort to corroborate the sexual abuse allegations. The only evidence developed exculpated Plaintiff.

58.    The DCFS records demonstrated that N.B. had serious intellectual, behavioral, and cognitive impairments that resulted from her neglectful and abusive background. They also knew that Defendant Blue had complained about N.B.'s inappropriate sexual conduct toward her younger brother. Defendant Blue also complained that N.B. routinely lied and did not seem to understand that she should not lie.

59.     The DCFS Defendants also discovered more evidence and reports that N.B. had been sexually abused prior to her placement with the Blue's. The DCFS Defendants reported that information to Defendant Warren but together they agreed to conceal the information from Plaintiff and the criminal justice system.

60.     Defendant Warren urged the Williamson County State's Attorney's office to charge Plaintiff with aggravated sexual assault against N.B. even though no probable cause existed to support the charge, and he knew that N.B.'s account was entirely fabricated by him, Defendant Grundy and Defendant Blue and had been reinforced by Defendant Brown.

61.     Defendant Warren consulted with Defendant Irvin about approving sexual assault charged against the Plaintiff. Defendant Irvin told Defendants Warren, Grundy and Garnett that if DCFS made a finding that sexual abuse was indicated, she would persuade the assistant state's attorney to approve criminal charges against Plaintiff.

62.     On January 28, 2020, Defendant Grundy, with the supervision and approval of Defendant Garnett, made a finding that sexual abuse was indicated even though Defendant Grundy knew she had helped fabricate the claim, no other evidence supported the allegation, and that she had concealed evidence that showed that N.B. had been previously sexually abused before her placement with the Blue family and she was high risk for a false allegation. These Defendants also knew that Defendant Blue had incredible animosity toward Plaintiff and had urged N.B. to adopt the false story.

63.     On February 18, 2020, Defendant Irvin interview Defendant Blue who repeated her allegations against Plaintiff, including her claims that he was into "weird" sexual stuff and had cheated on her.

64.    Defendant Irvin also interviewed N.B. who did not voluntarily make any claims of sexual abuse against her father. Instead, Defendant Irvin fed the false narrative to N.B. and coached her to repeat it. Defendant Irvin helped develop the fabricated evidence against Plaintiff, acting in an investigatory fashion. She then approved felony charged against Plaintiff, charging him with aggravated criminal sexual assault.

### Plaintiff's Wrongful Prosecution

65.    Plaintiff waived his right to a jury trial and proceeded to a bench trial before Circuit Court Judge Michele Shafer. The prosecution's case against Plaintiff hinged entirely on the fabricated testimony of N.B. – procured by the Defendant Officers, DCFS Defendants and the Defendant Prosecutor.

66.    Defendant Warren and Defendant Blue testified falsely at trial, claiming that N.B. had made an outcry accusing Plaintiff of sexual abuse when no such outcry occurred. In reality, a fabricated tale of sexual abuse, created by Defendants, was fed to N.B. that she later repeated with much coaching and urging.

67.    At no point did any Defendant produce to Plaintiff's criminal attorney comprehensive information about N.B. history of sexual abuse that pre-dated her placement with the Blue's.

68.    No physical or forensic evidence suggested Plaintiff was had abused his Daughter.

69.    During her testimony, N.B. admitted that she was not sure whether any sexual abuse had occurred.

70.    After the parties rested, Defendant Shafer retired to her chambers for a period of time. During that time Defendant Shafer reviewed a box of DCFS records and other discovery

material that had *not* been introduced into evidence by either party. Defendant Shafter removed her robe and began reviewing documents even though the documents had not been introduced into evidence. She abandoned her judicial function and acted in an investigatory function.

71.    Defendant Shafter found Plaintiff guilty of aggravated criminal sexual assault in a ruling she gave from the bench. In that ruling, she specifically referenced reports that had *not* been introduced into evidence by either of the parties

72.    Plaintiff was sentenced to six years in the Illinois Department of Corrections.

### Plaintiff's Exoneration

73.    Plaintiff always maintained his innocence.

74.    Plaintiff conviction was reversed outright by the Illinois Appellate Court after the court unanimously concluded that the prosecution had failed to meet its burden proof writing, "N.B.'s conflicting and unreliable statements from the witness stand, together with the lack of corroborating evidence, cast reasonable doubt about the defendant's guilt."

75.    The Williamson County State's Attorney filed a motion to reconsider and then a petition for leave to appeal to the Illinois Supreme Court. The Illinois Appellate Court ordered Plaintiff released on bond during the pendency of the PLA.

76.    The PLA was denied on September 27, 2023.

77.    The appellate court mandate was issued on December 7, 2023.

### Plaintiff's Damages

78.    Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff served over 20 months years in prison for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would have to serve the entirety of his sentence.

79.     Defendants conduct separated Plaintiff from his family and destroyed his

relationship with his children who he loved and was devoted to. Defendant's career was

destroyed and despite his acquittal must live with the reality that some people will always

wonder if he actually sexually abused his child, a heinous crime.

80.     As a result of Defendants' actions, Plaintiff continues to experience physical and

psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair,

rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence**

81.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully

set forth herein.

82.     As more fully described above, the individual Police Officer Defendants,

Defendant Irvin, Defendant Ble, and DCFS Defendants, acting individually, jointly, and in

conspiracy, as well under color of law and within the scope of their employment, deprived

Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendments by

fabricating statement of N.B. falsely implicating Plaintiff in sexual abuse of a child.

83.     In the manner described more fully above, Defendants fabricated, coerced,

manipulated and/or solicited false testimony from N.B., implicating Plaintiff in the crimes that he

knew he did not commit; falsified police reports; falsified a forensic interview, obtained

Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they

knew to be false when it was used against Plaintiff at his criminal trial.

84.     The Police Officer Defendants and Prosecutor Defendants concealed and

fabricated additional evidence that is not yet known to Plaintiff.

85.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of sexually abusing N.B. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

86.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

87.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT II
### 42 U.S.C. § 1983 – *Brady* Violations

88.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

89.     As described in detail above, all of the individual Police Officer Defendants and Prosecutor Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff.

90.     All of the Defendants concealed exculpatory evidence, including but not limited to, that: (1) N.B. had told investigators multiple times that Plaintiff did *not* abuse her; and (2) that she had serious sexual abuse in her background that helped explain why Defendants were easily able to coach her into telling a false story.

91.     The Defendants further suppressed their own misconduct and the misconduct of their fellow officers and DCFS workers.

92.     The Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 20 months in prison for a crime he did not commit.

93.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

94.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT III**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**

95.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

96.     In manner more fully described above, the Defendant officers, DCFS Defendants, Defendant Schafer and Defendant Irvin acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

97.     The Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

98.     In so doing, the Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

99.     The Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' fabrication of evidence, and suppression, and withholding of evidence.

100.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

101.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

102.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

103.    All of the individual Police Officer Defendants, DCFS Defendants, Defendant Blue, Prosecutor Defendants, Defendant Schafer and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

104.    All of the individual Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

105.    In this manner, the Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

106.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

107.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

108.    As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT V
### 42 U.S.C. § 1983 – Failure to Intervene

109.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

110.    In the manner described above, one or more of the individual Police Officer Defendants, the Defendant Prosecutors, DCFS Defendant and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

111.    These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

112.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

113.    As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

114.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

115.    All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

116.    The Defendants accused Plaintiff of sexually abusing N.B., knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers and Prosecutor Defendants DCFS Defendants and Defendant Blue knowingly made false statements with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

117.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

118.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

21

**COUNT VII**
**State Law Claim – Civil Conspiracy**

120.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

121.    As described more fully in the preceding paragraphs, the Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

122.    In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

123.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

124.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

125.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT VIII**
**State Law Claim – Intentional Infliction of Emotional Distress**

126.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

127.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

22

128.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

129.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

130.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT IX
### State Law Claim - Willful and Wanton Conduct

131.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

132.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

133.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

134.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNTY X
### State Law Claim – Parental Alienation

135.    Defendant Blue, along with Defendants Warren and Grundy, together conceived of and did carry out a plan to alienate Plaintiff from his daughter by manipulating N.B. and falsely telling a highly suggestible child that her father had abused her. This conduct was child abuse itself.

136.    Defendant Blue acted intentionally when she falsely told N.B. that her father sexually abused her and then convinced her to repeat the false story to Defendants Warren and the DCFS Defendants, and Defendant Irvin. N.B. eventually conceded she was not sure the story was true from the witness stand.

137.    Defendants alienated N.B. from her loving and devoted father. Plaintiff suffered and continues to suffer extreme emotional distress as a result of the intentional conduct of Defendant Blue and the other Defendants.

## COUNT XI
### *Respondeat Superior*

138.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

139.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Marion Police Department, an agency of the City of Marion, acting at all relevant times within the scope of their employment and under color of law.

140.    Defendant City of Marion is liable as principal for all constitutional violations committed by its agents.

## COUNT XII
### Indemnification

141.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

142.    Illinois law provides that public entities must pay any judgments for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

143.    The individual Defendant officers are or were employees of the Marion Police Department, an agency of the City of Marion, who acted within the scope of their employment in committing the misconduct described herein.

144.    The individual Defendant Prosecutor is or was an employee of the Williamson County State's Attorney's Office, an agency of the County of Williamson, who acted within the scope of her employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff David Blue prays this Court enter judgment in his favor and against Defendants THOMAS WARREN, SCOTT MORSE, ROSE GRUNDY, VERETTA GARNETT, LEAH BROWN, ELAINA SCERENA, LISA IRVIN, MICHELLE SCHAFER, LISA BLUE, CITY OF MARION, and the WILLIAMSON COUNTY STATE'S ATTORNEY, awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

**DAVID BLUE**

By:    /s/JENNIFER BONJEAN

Jennifer Bonjean
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

**Chicago Address**

53 W. Jackson Blvd., Ste. 315
Chicago, Illinois  60604